WALLACE, JUDGE:
This claim arises out of a construction project in Kanawha County designated as Project No. I-IG-77-2(39)89, (320-77-82.20 C-I), dated June 1, 1978. The parties to the contract are The Lane Construction Corporation, hereinafter referred to as Lane, and the Department of Highways. The contract completion date was October 31, 1980. The project consisted of the construction of approximately 4,730 linear feet of a four-lane, concrete paved, divided highway (West Virginia Turnpike 1-77), 4,300 linear feet of relocated U.S. Route 119, eight bridges, four interchange ramps, and various other incidental items. Lane contends that various delays were incurred as a result of plan errors, changed site conditions, and respondent's failure to timely approve rock borrow sources as well as extra work necessitated by various design changes. Lane also included three additional claims for particular costs which it incurred in the construction of this project. The actual completion date for the project was in October 1981.
Lane alleges the following items of damages:
$1,735,482.00 (1) Increased unclassified excavation
$154,413.00 (2) Increased rock borrow excavation
$26,269.00 (3) Increased Portland cement costs
$18,964.00 (4) Increased concrete production costs
*181 (5) Increased structures costs $148,396.00
(6) Increased traffic maintenance costs $65,853.00
(7) Increased indirect costs $187,922.00
(8) Increased project layout costs $23,868.00
(9) Increased property tax costs $17,974.00
(10) Increased home office overhead costs $73.278.00
TOTAL. OF DELAY CLAIM $2,452,419.00
The extra work portion of the claim consists of the following items:
(1) Temporary concrete median barrier $16,278.00
(2) Relocation of waterline $1,200.00
(3) Rebuilding shoulder at toll plaza $6.349.00
TOTAL OF EXTRA WORK ITEMS $23,827.00
The first phase of the contract required Lane to fill a swamp area for the relocation of Route 119. The plans indicated that Lane would need approximately 94,989 cu yds. of select rock for this swamp area. This item was critical as the contract required that the area be allowed to settle for 450 days before completion of the area. Phase I also included construction of two access ramps and a portion of the northbound lane of the interstate. The plans indicated that the cuts in the area of relocated Route 119 would yield sufficient rock to complete the fills and leave a surplus of rock of 17,235 cu. yds. There were also supposed to be approximately 152,000 cu. yds. of rock available in the cuts adjacent to access road three. Only a portion of the rock would be needed for the embankments for Route 61. According to the plans, Lane would need to "borrow" 143,730 cu. yds. of select rock during the first phase of the project.
Lane submitted requests for rock borrow in early July 1978 in anticipation of the needed rock for Phase I construction. The request to borrow rock from Rock Borrow Areas 1 and 2 was made July 5, 1978, and the request for Rock Borrow Area 3 was made July 8, 1978. The respondent denied permission to borrow rock in these areas but the actual denial was not forthcoming until mid-August 1978. Lane alleges that its failure to offer a royalty for the rock in these areas which were within the project limits was the reason that it was not permitted to borrow from these areas. In early August 1978 Lane submitted requests to borrow rock from Rock Borrow Areas 4, 5, and 6. These requests were acted upon in a timely manner by respondent and Lane was permitted to borrow rock from Rock Borrow Area 4 when it was approved in early September 1978. The requests for areas 5 and 6 were denied. Borrow requests for Areas 7 and 8 were made on August 31, 1978. Area No. 7 was approved on September 28, 1978. Rock was available almost immediately from Area 7 an Lane was able to develop the rock from Area 4 shortly thereafter.
*182 By this point in the project, Lane recognized that the rock indicated in the original plans was not present on the project. It was anticipated by both parties that this project would be a "borrow" job. However, Lane needed a significantly greater amount of select embankment in the swamp area than indicated in the plans. Lane alleges that respondent measured the swamp area from the top of the water in the swamp rather than from the bottom of the swamp. This area required 140,000 cu. yds. of select embankment. The plans indicated 94,000 cu. yds. would be needed.
During this time Lane was completing excavation operations in the area that was to have produced the major portion of rock and the rock was absent. In these areas Lane was stockpiling unclassified material from the cuts where the plans indicated rock would be found. For example, one cut on the plans indicated 38,000 cu. yds. of available rock, but the cut contained no rock borrow. In another cut, the plans indicated 150,000 cu. yds. of rock, but contained only 150 cu. yds. This set of circumstances placed Lane in the position of stockpiling unclassified material which was not contemplated by the original plans. At the same time, Lane was in the construction phase in which select embankment requirements were increased. As a result, Lane was thirteen weeks behind schedule by the end of the 1978 construction season. Lane alleges the delay was due to respondent's delay in approving and disapproving borrow site requests.
The problem of lack of select rock on the project continued into the 1979 construction season. An extension for borrow from Rock Borrow Area 9 was requested on April 27, 1979, and approved May 17, 1979. The respondent authorized the borrowing of 48,000 cu. yds. of rock as it believed that sufficient rock was still present in the other cuts to be developed within the project limits. As the project progressed, lane actually ended up borrowing another 46,000 cu. yds. of rock. At each juncture of the project when rock was necessary Lane's progress was delayed by a lack of rock. In fact, during Phase I, Lane actually placed 140,000 cubic yards of rock. During Phase I, it was necessary for Lane to borrow 49,952 cu. yds. more rock than the contract quantity of borrow indicated for the project.
Respondent contends that it does not approve borrow sites within project right of ways. According to respondent, Lane was well aware of the normal policies regarding rock borrow areas and knew prior to the construction of this interchange that borrow areas would have to be found off the project site. Respondent also indicated its position with regard to the rejection of the borrow areas. The reason for rejecting borrow from areas 1, 2, 5, and 6 was that these were located within the State's right of way of the project limits. Areas 2 and 3 were rejected as respondent was of the opinion that these areas had unstable soil conditions. There was no explanation for the immediate answer provided to Lane for areas 5 and 6. Furthermore, respondent asserts that the delays in the approval, if any, were not unreasonable given their potential impact on the design of the project. Respondent also contends that there were a number of delays which were solely attributable to Lane.
A project which was calculated to be a borrow job, in that the respondent had estimated that the project limits contained approximately 160,000 yards of select sandstone borrow, and that *183 the job would require approximately 48,000 yards of common borrow ended up being a waste job. Robert J. Richards, formerly with Lane as a district manager, stated that"... the job ended up not being a borrow job, but a waste job ... ." Timothy M. Rush, District Manager with Lane, confirmed Mr. Richards' opinion that what was termed a borrow job turned into a waste job.
The contractor's progress reports for the months of July, August, and September 1978 reflected the fact that work was delayed due to a lack of availability of rock borrow. The total deficit of rock on the project was approximately 140,000 cu. yds.
In terms of a borrow job, the speed with which the contractor is able to obtain the borrow, and the amount of borrow which can be obtained, are of obvious importance. The ratio of select rock to common material was likewise important in order to expedite the project's construction and to meet the contract requirements. The amount of common material in the cuts was considerably more than that specified on the contract drawings. Should the amount of select embankment required to make this embankment increase, then an amount of select sandstone is also needed and must be obtained from some other source. This material may be obtained from the prescribed cuts or from rock borrow. It was impossible for the contractor to complete this job within the time period provided unless rock was borrowed early in the construction phase. If the material in the amount needed for the embankments could not be obtained from the cuts, the only to obtain it was to stockpile all the unclassified excavation until the select rock could be removed from the cuts.
Due to the large quantity of borrow listed in the plans, it appeared that there would be a minimal stockpiling of material necessary during the construction of the project. Lane planned to gradually work the earth work back on top of the rock fills as the fills were constructed. Instead of a cut-stockpile-fill operation, Lane was in a position of stockpiling much more unclassified material. Stockpiling doubles the cost of unclassified excavation as the contractor is loading, hauling, and placing the material twice; however, the contractor is being paid only once.
The problem of having sufficient rock on the project continued until May 1980 when the parties agreed that Lane could borrow another 10,000 cu. yds. of rock and respondent deleted 20,000 cu. yds. of select embankment which eliminated the need for additional borrow. Lane was able to maintain anticipated level of production for the duration of the project. Lane completed the project approximately one year after the original contract completion date.
The delays occasioned by the rock borrow problems impacted and slowed the entire project. The cost of items contemplated to be purchased within the time frame of the contract increased. These increases are alleged to have been incurred by Lane as increased costs for which Lane has not received adequate compensation.
The respondent's position is that Lane was paid for all rock borrow at a price agreed to in a change order and that delays were occasioned by Lane's actions during construction. *184 Respondent takes the position that the borrow areas were approved in a timely manner considering the impact the areas had on the project as a whole.
Lane contends that it is entitled to an equitable adjustment of the contract in accordance with Section 104.2 of the Standard Specifications.[3] Lane also contends that respondent breached its duty not to delay or hinder Lane's performance of the contract. The respondent allegedly hindered Lane by refusing to approve early borrow requests and by failing to timely reject or accept requested borrow areas.
A complete discussion of changed conditions on a project may be found in the claim of A. J. Baltes, Inc. vs. Dept. of Highways, 13 Ct.Cl. 1 (1979). The circumstances herein constitute a changed condition. The plans indicated that the contractor would have sufficient rock within the project limits to complete the major portion of select embankments. This contractor was faced with site conditions which not only delayed construction of the project, but created extra costs which could not have been contemplated at the time the contract was bid. Therefore, the Court finds that the changed condition on the project caused Lane to incur costs for which it should be compensated.
The Court, having examined the record in this claim, is of the opinion that Lane is entitled to an award for the delays which resulted from the lack of rock borrow on the project. Lane established that payment for the rock borrow at the contract bid price did not fully compensate Lane for the problem with the common material which had to be moved within the project limits. In attempting to satisfy the respondent as to the availability of rock within the project cuts, Lane expended time and effort in removing common material from the cuts. The rock was not there. In addition, Lane stockpiled wet, unsuitable embankment for later use on the project. However, the project ended up as a waste job. Lane had bid the job as a borrow job and the circumstances which occurred doubled the cost of unclassified excavation.
The Court agrees with the respondent that Lane has been paid for the rock borrow at the contract bid price. Lane could have negotiated for an increase at the time of the change order entered into by the parties. Therefore, the Court is of opinion to deny the claim for increased rock borrow excavation costs.
*185 The bid item for unclassified excavation was $5.50 per cu. yd., whereas Lane claims that the actual cost was $7.13 per cu. yd. when the handling of the material is considered. The Court is of the opinion that Lane did in fact incur costs which were attributable to the extra handling of the unclassified excavation. It is the opinion of the Court that respondent's failure to timely approve borrow areas in light of this item's critical import on the progress of the construction did, in fact, delay Lane. While the time period for the delay is difficult to ascertain, it is clear that Lane is entitled to an award. However, the costs for indirect items, property taxes, and home office overhead are denied as being too speculative in nature.
A review of the three additional claims which are a part of this claim follows. The first claim involves extra cost for concrete median barriers which resulted from a change in the plans which required an additional amount of barrier at a later date and the price had increased during the interim. The difference in price of the barrier and overhead costs was $16,228.00. The Court is of the opinion that Lane is entitled to recover $16,228.00.
The second additional claim consists of the cost for a water line which Lane was required to lay twice due to an error in the plans. The claim represents the difference in the contract bid price and the actual cost of the water line at the time of the second installation in the amount of $1,200.00. The claimant is entitled to recover $1,200.00 for this item.
The third claim in the amount of $6,349.00 represents the cost to Lane for rebuilding a shoulder area at a toll plaza which was constructed by another contractor. The respondent contends that Lane did not coordinate the construction of this area with the second contractor as required by the contract, specifically Section 105.7 of the Standard Specifications. The Court agrees with this contention of the respondent and denies this claim.
The Court makes an award in the amount of $517,478.00, which includes the $16,228.00 and $1,200.00 discussed herein.
Award of $517,478.00.

Should the Contractor encounter or the Department discover during the progress of the work subsurface or latent physical conditions at the site of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the contract, the Engineer shall be notified in writing of such conditions; and if the Engineer finds the conditions do materially differ and cause an increase or decrease in the cost of, or the time required for performance of the contract, an equitable adjustment will be made and the contract modified in writing accordingly. 11.